If I'm saying that correctly, we have Mr. Henry, who would like to reserve two minutes for rebuttal. Is that right? That's correct. And just for everybody, as you do come up to the podium, please take a second to adjust it up or down as needed. There's a button on the right-hand side that raises and lowers the podium, and then adjust the microphones, too, just to make sure that we can all hear you. And we're also recording the audio, so it's available on our website later for your distant audience. So, Mr. Henry, whenever you're ready. Thank you, Your Honor. Good morning. May it please the Court. I'm Brad Henry. I represent Dr. Zheng.  First and importantly, while there was evidence that Dr. Zheng intended to create aviation seals using proprietary technology not belonging to GE, using, in part, Chinese government financial support, and simultaneously creating different seals that would have benefited GE with GE technology, there was no tie between Dr. Zheng's intent to benefit the Chinese government and his use of GE technology to do so. The government did not present evidence sufficient for a jury to conclude that Dr. Zheng used GE trade secrets intended to benefit the Chinese government. So, just to be clear, are you arguing that even if there was enough proof that he intended to benefit the Chinese government, that the particular technological information he was providing about particular seals was not of benefit to the Chinese government? Just if you could clarify what, in your view, is the missing link there. I'm trying to understand your argument. So the evidence at trial showed that Dr. Zheng was in possession of GE technology in really two buckets. One was technology related to information that he had sent to himself through a program called steganography. It's not a program. That's a cryptological method of hiding information inside a picture. It is. It's not a program. That's just sort of a method. A method. Yeah. So that information stayed with him at his home, on his home computer, and never went any further. And you would agree that anyone who uses steganography, there's certainly a permissible inference that a fact finder could draw that the person was trying to hide that. I don't understand. I've never understood why anyone would use steganography if not to disguise or conceal  Would you agree that that's a permissible inference, at least? It is permissible that he was trying to hide it, but not in a criminal context. There was a lot of testimony at trial about the reasons why he would do that. In fact, it was to protect GE technology, which was a theory, presumably, the jury accepted, given the charges with which he was either acquitted or the jury hung. The purpose of that was for him to do work at home. There's plenty of testimony about that at trial. The information that was sent to his colleague in China related to turbine seal technology for steam turbines was information that was not either interesting to the Chinese government under their 13th, fifth year plan, and or technology that he intended to give to the Chinese government. We have a witness that the defense put on who made very clear that it was his intention. Evidentiary sufficiency, we look at it like most favorable to the jury verdict. So as far as a defense having put on a witness, the jury was free to discredit that witness. What you have to look for is evidentiary gaps, not strengths in your case, but evidentiary gaps in the government's case. Right, and so there are no connections between that information that Dr. Zhang sent to create seals for GE versus the information that the Chinese government would have been interested in. And you don't think that the jury, as the fact finder, could have inferred that this seal technology would have been to the benefit of the Chinese government? Not based on the evidence that was submitted at trial from the government, no. And is that because, in your view, they didn't want it? Is that the sole basis for saying it couldn't have benefited them because they didn't ask for it or want it? Well, I think both. They didn't ask for it, nor did they want it. It was- Right, so then, but that's different from benefited from it. If I neither need or want something, but you give it to me anyway as a surprise gift at my birthday, you may have benefited me, even though I didn't ask for it, I may not want it or need it. But it may, you know, you give me a check for $1,000, I've benefited from it, even though I didn't want it or ask for it or need it. But there's no evidence that it was given as a gift either to the Chinese government. But isn't it a conspiracy? I'm sorry? I thought it was a conspiracy. It is. There's no- They don't have to execute a conspiracy. And or any intention to do it. But do you have to carry it out? I thought a conspiracy was an agreement to do something. It is an agreement. But there was- So you don't have to carry it out. You can have an agreement- Of course you can. A conspiracy to rob a bank, and no bank ever gets robbed, right? That is correct. So I guess I'm not following why the failure, in your view, to give it defeats proof of a conspiracy to give it. There was no agreement to give it either. Okay, well that's fine. So why don't you talk about that? Okay. Just before, there was a lot of focus in that back and forth on whether or not it would actually benefit the Chinese government. Yes. I just want to make sure I understand the statutory requirements. Does it have to be an actual benefit, or does the jury just have to conclude that he took the secrets intending to benefit the Chinese government, whether or not his intent was ill-founded? So the statutory language says, intending to benefit the Chinese government. But that language, I think, to the further point, right, which is that assuming that, I guess, too, let me divide this into two arguments, and I'll move to my next step. Which is, assuming that intent to benefit the Chinese government is clear, which we argue it is not, and it is ambiguous. But assuming that it was clear, the evidence is insufficient to overcome that burden. But given the fact that it is not clear, then the court here, like in Lan Lee. Is it your view that there was no evidence that it might be of interest to the Chinese government, or that it was of interest to the Chinese government? Because you had said that earlier, and I was intrigued by it. Yeah, so the evidence related to the interest of the Chinese government came really through three ways. One is the 13th fifth year plan, two is another plan by the Chinese government putting out what they are looking to increase in their technological portfolio. And the third is the expert's testimony, right? And we went through this with the expert in some detail. What they are interested in is aviation seal technology. They are not interested in steam turbine or ground turbine technology. And so the information underlying the information that was sent to China by Dr. Zhang related to steam or ground turbine technology. Which is a very old rudimentary sort of technology. And by the way, GE sells those turbines in China and has a whole division. They have, in essence, that technology. So, and the seals, by the way, are third party seals. GE buys them off the market. It is not something that GE produces in house and uses in their turbines. And so they are looking for suppliers. And Dr. Zhang in the testimony was asked to find suppliers, and so he was looking to fill that gap. Providing a benefit to the foreign government, though, we argue is ambiguous, right? What does that really mean? And there is a clear dichotomy between 1831 and 1832 in the trade secrets versus economic espionage aspect. And we've asked the court, well, I've got one second left. Why don't you keep going, I think we may have a couple more questions, and we have a short calendar, so. Okay, thank you, Your Honor. Our money's worth out of you today. That sounds good, that sounds like a plan. On the day that the Economic Espionage Act was passed, Senator Cole pointed out that legislation would be used to go after foreign intelligence agencies on the one hand, and people, quote, who walked out of companies with millions of dollars of information on the other hand. This distinction is important in the way that the Economic Espionage Act came into existence, which we talked about and the government has also talked about, as it relates to 1831 and intelligence activity. The act was put forward at a time when theft of trade secrets had been dealt with in state court. There was no federal criminal remedy, and so the government was looking to fill that gap. So, I'm sorry, is it your argument then that based on the legislative history you just quoted us, you would read into intent to benefit either of two things, one, that it was based on, I can't remember your exact wording, something about foreign intelligence activity, or someone walking out of a company with millions of dollars of trade secrets? Well, that dichotomy is important, and I think Senator Cole talks about that. And when he's talking about this, keep in mind when you're reading through the statements that day, he's talking about foreign intelligence very much in the context of spies. He gives examples of the DGSEU, which is the French Intelligence Agency, putting agents within Corning and other American companies. Let me just give you a hypothetical then. Under your reading, which would require either coordination or active involvement of a foreign intelligence agency, if a defendant stole the crown jewels of GE's most advanced technology, and let's assume that it was listed as the top most desirable thing in China's five year plan. And he flew to Beijing and he handed it to Xi Jinping and said, here you go. These are the best secrets that we've got in all of American industry. But he did it spontaneously. You would say that he cannot be prosecuted under the statute because there was no involvement of a foreign intelligence agency. Am I correct that under your theory, the hypothetical I just outlined would not be penalized? If he was either not directed or asked to do so, or not an agency, if he's just a person off the street and walking. He would be guilty under 1832, but not guilty under 1831, and Senator Cole tells us why. He distinguished 1831 and 1832 by saying that the Economic Espionage Act enhances the penalties when the theft is at the behest, and that word is important, of a foreign government. And what did he mean? He meant that 1831 had increased penalties when the action was taken at the command of a foreign government. They're quite clear about that. That's not the only place language like that appears in the legislative history. Where's that in the language of 1831? Whoever intending or knowing an offense will benefit any foreign government. Where's the requirement that the foreign government have solicited the information? It's not in the statute. That's the point. That language is ambiguous. What does intending or knowing to benefit a foreign government really mean? The hypothetical you were just given, someone takes a very important trade secret from a corporate entity in the United States. And takes it to another foreign country that's already publicly expressed an interest to advance itself with regard to self-driving cars. And then says, hey, my grandmother was from your country here. And by the way, let's talk about money. The injury to the corporation of the United States is the same, whether that theft was solicited by another foreign country or just by the greed of the thief. The injury is the same. The statute doesn't have some kind of hurdle of foreign involvement. It would be foolhardy, would it, not to allow one act to go by. And limit the others only to when foreign nations took the time to solicit or recruit an agent. Yeah, so when you're looking at the way that the statute was put into place. I can understand that the Senator had a view and that the Senator then read on the floor of the Senate, which then probably was quoted in the New York Times and perhaps back home in his home state. But that's what statements of intent often are done. We did that regularly back when I served in public office. I may have done it myself in any event. That's not what they passed. We're stuck. We're left with what they passed. This is, these are the guideposts, understanding these parameters are what define criminality in that context, not the Senator's intentions, correct? Well, respectfully, yes and no. It's, not that. I know, I'm sorry. But it's- There's only two cases today, so go ahead. Yeah, fair. So what he went on to say, and I think to your question, it's like, what does the statute say? Right, if you just read it. Right, it says intent or knowing it would benefit a foreign government. I agree, that's what it says. But it remains, what was the intent of that? Because this was quite a long process through which they went through multiple bills, put them together. There were amendments and so on and so forth. And so what did Congress intend for this to cover? He goes on to say, and I think this maybe answers your question a bit, which is 1831 penalizes trade secrets as it relates to foreign governments. And is not meant to penalize conventional commercial theft or misappropriation of trade secrets. And so, it is what they- This is not a crime if you're just giving it to foreign company in country X. That would be your typical- That's in 1832. Conventional theft, it has to be an intent to benefit the foreign government or agent or instrumentality. I think they're looking at, at the time it was committed, what was that person's intent, right? At the time the information was taken, not what the end game is necessarily. The thing that makes this tough is that the monolithic kind of nature that the government and that the universities are co-terminus with the government and that their agencies and instrumentalities. That's really where the problem lies for you, isn't it? Yeah, I think so. I mean, part of the issue at trial was, is while the expert was able to talk about the way the Chinese government was set up. And of course, under their system of laws, every company, according to the expert, is controlled by the Chinese government, right? There is no private business in a real sense. Although, one of the areas we explored was GE exists in China, and so is therefore GE a Chinese company. Yeah, but this is not an edge case. I mean, this is actually helping the universities that are creatures of the state, right? Yes, well, certainly Dr. Zhang going to China and doing research for the Chinese university, no doubt. I just want to follow up on Judge Rodini's hypothetical. When you said that wouldn't be in 1832, it would be in 18, or it wouldn't be in 1831, it would be in 1832. I want to tweak the hypothetical slightly. Okay. There's no commercial competitive benefit to the Chinese government of the secrets that are being disclosed. But there's an enormous defense benefit, right? With that tweak, would you still say that that conduct would fall under 1832? If the technology that he, assuming he intended to give it to the Chinese government, was for a military benefit versus a purely economic benefit. Correct. No, I think the analysis is still the same, right? If you're looking at his, what he did at the time he did it, putting aside the end result, right? I think what Congress was trying to do was to criminalize two buckets of activity. One is, I am taking these secrets with an intent and at the behest of a foreign government to give to that foreign government. Right, and I understand your theory, the two buckets. What I'm struggling with is, in response to that hypothetical, the answer is, that's the second bucket. But the second bucket is defined specifically with reference to economic benefit to somebody other than the owner of the trade secret. And so I'm trying to figure out, this is just, it's not somebody who's looking for an economic benefit to themselves or the government, but a defense benefit. That feels to me like something that is within the scope of what 1831 would cover, but I gather on your theory it's just not. I see what you're saying, I see what you're saying. So first let me say that Dr. Zane's information that he was filling had zero military application. No, no, I know. And so in your hypothetical, if a person's intent to walk out was for a military, pure sort of traditional military espionage purpose, if it had that intent to benefit the foreign government under their military apparatus, right? Which would include intelligence activity. Then I think 1831 may apply. But I also- Even if the Chinese government didn't solicit it? I mean, I still think there's a requirement that there be some involvement by the Chinese government, whether he's an agent or at the behest of. Okay, all right. Why don't we do this, unless there are further questions, right now we've kept you up considerably past your time. That's okay. You have reserved two minutes, unless you want to use those two minutes now, we will hear from the government. You want to use the two minutes now? Because you can if you'd like. It's your time. Maybe I'll just touch on the Kaiser analysis. Then why don't we quick set it to two minutes and then we'll see how much you use, so please. Thank you, Your Honor. So moving away from the first count to Kaiser, in our view Kaiser renders the sentencing guidelines commentary on intended loss useless. And in this case, it should at the very least be remanded for resentencing. In Stinson, the Supreme Court, of course, said that guideline commentary can be taken into consideration. But here, this is an issue that has not been decided by the Second Circuit. There are a number of circuits who have decided the issue about how Kaiser affects Stinson. And there is quite a large circuit split. But to be straightforward, loss does not include intended loss under any reading. And if you compare the analysis of the definition in 4B1.2, which is considered in Winstead and Havis, that makes sense. Because while it does define violent crime, it does not include inchoate crimes. And so for us, the circuit court in Havis also emphasized how in Mistretta, it was originally ratified. The constitutionality of the commission's role in large part would remain fully accountable to Congress. And they do do that, but the commentary is not vetted by Congress. I think if you look at the cases that have decided this issue, the ones that have gone in our favor, the court has entered into an actual analysis on the merits for the circuits who have decided that Stinson still applies. They have not engaged in that merits analysis. They have basically said we need en banc approval and or we need the Supreme Court to decide it. But including the Ninth Circuit who said that. But they said if we could, we would decide based on the merits that Kaiser overrules Stinson and the loss cannot apply. And that's what we've done. Mr. Henry, you've used all of your time now, which is fine. It's certainly your discretion to do so, and we thank you for your argument. Mr. Sutcliffe for the government. Good morning, may it please the court. Thomas Sutcliffe on behalf of the United States. I'll begin with the sufficiency of the evidence issue. So the text of 1831A is very straightforward. It states that a person commits a criminal offense if he misappropriates, attempts to misappropriate, or conspires to misappropriate a trade secret, quote, intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent. And the legislative history here makes clear that Congress intended for the intent prong to be very broad. It states that very explicitly in one of the congressional reports. And it makes clear that that could be any number of different benefits. Well, if you could, putting aside the legislative history for a moment, could you just identify in a few quick bullet points, what you view as the key evidence before the jury that shows there was an intent to benefit a foreign government or instrumentality? Yes, your honor. So first, there was the testimony of the government's expert, Professor Chen, who testified that during the relevant period, the Chinese government, the PRC, was actively trying to promote the domestic production of ground and aerospace-based turbines. And in fact, had codified that requirement in, among other things, its 13th five-year plan. There also was evidence that during the same period, Zheng misappropriated numerous trade secrets having to do with the design and testing of turbines, including sealing technology, which GE witnesses testified was critical to allow the turbines to operate efficiently. A jury here also could have inferred that he sent all of those trade secrets to his business partner in China. It is true there's only direct evidence of him emailing some of those trade secrets, but the other ones that were ones that were simply sent from his GE email account to his personal email account, at which point GE's ability to monitor what he was doing was lost. So it's not as though, it's true we can't say there wasn't direct evidence saying, yes, he then forwarded them to his business partner, but a reasonable jury here could infer that if he was sending other trade secrets to his business partner, that he was doing the same thing with all of them. In addition to that, there was evidence that around the same time, Zheng started two companies in China that were focused on the design or manufacturing of trade secrets. And there was also evidence that Zheng made numerous representations to Chinese government officials, in which he highlighted his company's abilities to help China meet its strategic economic goals, and specifically cites to the 13th Five-Year Plan. Further, in addition to that, there was also evidence that Zheng's companies either entered into, or at least contemplated contracts with multiple state-owned universities and at least one state-owned research institution. Which, so Your Honor, a jury here, they could have found one of two things. They could have found that Zheng intended to benefit the national government directly, or they could have very least have determined that he intended to benefit multiple state-owned instrumentalities. And either theory here would have been sufficient. Your Honor, with respect to, and the one thing I would note, Your Honor, is although there is not a lot of case law in this area, the government submits that what little there is support its position. And I would highlight the Sixth Circuit's decision in the United States versus you case from last year in 2023. That case involved a set of facts that has some striking parallels to the facts here. You involved a defendant who misappropriated trade secrets from multiple U.S. companies, and that while starting her own company in the PRC. And in you, the Sixth Circuit determined that there was sufficient evidence that the defendant intended to benefit the PRC. And highlighted in particular, the fact that the defendant had submitted a request for funding to the Chinese national government. And in that request for funding, had highlighted the fact that her companies could help China achieve strategic objectives. In that case, it had to do with evading international trade restrictions. Here, Your Honor, we have the exact same type of representations. In fact, that's particularly evident in the project initiation application that Zheng completed in 2017. I'll note, Your Honor, that that begins on page 109 of the government appendix. In which he also talks about helping China and having his businesses help China achieve the goals of the 13th Five-Year Plan as well. And that's before we even get to some of the contracts, specific contracts, that Zheng entered into with foreign instrumentalities. Now, Zheng attempts to get around this requirement, or around this evidence, by essentially grafting an entirely new requirement onto the plain text of the statute. He insists that the government also has to prove, essentially, that a foreign government directed or asked the defendant to commit the misappropriation. And I take it there's no case out there that indicates anywhere that that is such a requirement that appears in the statute, is that? Your Honor, certainly not at the appellate level. In the U case, for example, there was no indication in that case that the PRC had ever asked that defendant, or coordinated with that defendant, the theft of the misappropriation of any trade secrets. The closest any case comes is the district court's case in Lanley, which is cited in the appellant's brief. That does rely on an analysis of statutory history similar to Zheng's here. But even there, it's a factually distinguishable case. I would submit that the evidence intent in the Lanley case was quite a bit less than what we have present here. Your Honor, with respect to the legislative history, I think it's more productive to focus less on what individual lawmakers said, and focus more on the evolution of the statute that ultimately became 1831. It's significant in that regard that there was an earlier version of the statute that would have applied, or excuse me, there was an earlier version of the bill that became the statute that would have applied to anyone who acted, quote, with knowledge or reason to believe that he or she is acting on behalf of, or with the intent to benefit, any foreign government instrumentality or agent. But that on behalf of prong does not make it into the final statute. What that suggests is that Congress considered a state sponsorship requirement, very similar to the one that Zheng is advocating for here, but it ultimately chose to reject it. And it ultimately, obviously did not decide to include that in the plain text of the statute. So, Your Honor, for all those reasons, the government submits that there was more than sufficient evidence here to support the jury's verdict. Unless the court has any further questions on sufficiency, I'm happy to address the sentencing issue as well. Your Honor, with respect to 2B1.1, I'll first note that this court has repeatedly upheld guidelines calculations that rely on intended loss under 2B1. A good example of that's the United States versus Lacey decision from 2012, where this court actually cited Stinson for the proposition that note 3A in the commentary is binding. Now, presumably what Zheng means to argue is that Kaiser v. Wilkie abrogates that prior precedent. But it's a curious argument because if there's one theme that pervades the entire Kaiser decision, it's the Supreme Court's unwillingness to disturb settled law. The primary holding of the Kaiser decision was the Supreme Court's decision to uphold two of its seminal past cases. A case called Bowles v. Seminole Rock and another called Orr v. Robbins. And one of the reasons why the Kaiser court decided not to overturn those decisions was a recognition of the fact that for decades courts had been relying on those doctrines to uphold agency regulations or interpretations of regulations. Does the Sentencing Commission's proposed amendment to bring the intended loss out of the new and up into the text, I guess that's, takes effect if Congress doesn't do anything by November. Does that affect our analysis or can we not consider it until November? Your Honor, I don't think it does. Obviously, that amendment wasn't in effect at the time of this sentencing. So I don't think it would have, it can't be retroactively applied. I don't think- So you don't think that's a clarifying amendment? You actually think that's a change amendment? I think that would be correct, Your Honor. But I would, well- Because if it's not a clarifying amendment, I think you lose, don't you? If it's not a clarifying amendment in that, well, I mean- And that's why it can't be applied retroactively, then that suggests that the status quo ante is what your counterpart says. Well, our position is that the word loss, as it exists in the current version right now without the amendment, should be construed to include intended loss. If the commission's proposed amendment goes into effect, that I think would remove any doubt as to that issue. But I don't think it weakens our position for our interpretation of the guideline as it exists right now. And I certainly don't think it's the commission conceding that there was any problem with the commentary or anything like that. Right. Sometimes things get moved out of the commentary into the body of the guidelines simply to avoid litigation. I mean, just to avoid doubt on matters, because beforehand everyone thought that if it's in the commentary, that's it. And now that there's a question about whether things in the commentary count or they've been moving things up. I think that's correct, particularly whereas here there's now been a circuit split on the issue. This is the commission doing exactly what it should do in trying to reduce litigation. I'll also note- Do you think this court, do you think we, I don't know, as a panel or even sitting on bunk, would have the ability to call into question the vitality of Stinson? Or is that something only the Supreme Court can do, to say that one of their later precedents has called into question the validity of one of their earlier precedents? Is that something we can do? Your Honor, that's an issue that's been, that's torn apart the different circuits on this. Some courts have taken the position that as a matter of vertical stare decisis, that is an issue that only the Supreme Court has the prerogative to do. Other courts have taken the position that- Yeah, and I'm curious what the government's position is. Your Honor, I would say that at least in this circuit, this court has already resolved that issue. There have been at least two cases where this court has reaffirmed, post-Kaiser cases, where this court has reaffirmed its pre-Kaiser precedent. Well, but did we say, did we just apply Stinson, or did we say Kaiser doesn't disturb Stinson? Your Honor, what happened, so there's two cases I would point to. The first is the United States versus TAB case from 2020, where this court reaffirmed United States versus Jackson. Now, the issue there wasn't 2B1.1, it was the career offender guideline. But nonetheless, this court upheld Stinson-era precedent. It did not explicitly reference Kaiser. Well, that's what I'm talking about. Right, but Kaiser was argued. No, I know, I know, but have we ever said anything out loud like Kaiser does not disturb Stinson, or anything like that? Were we empowered to even say such a thing? In 2021, in the United States versus Winn decision, admittedly an unpublished decision, this court did reject a Kaiser-based argument, explicitly rejected a Kaiser-based argument for reexamining Stinson-era precedent, and it cited to the fact that this issue had been raised and decided in TAB. So I think if you view those cases together, the net effect is that this court is still applying Stinson and has rejected arguments to the contrary. Unless there are any further questions from the panel. Okay, thank you very much. Thank you. We have both your arguments, and we will take the case under advisory. Thank you very much. Yes, thank you. Thanks very much to both.